UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                        :

CHRISTOPHER EDWARD HOWARTH    :          3:19 CV 905 (RMS)
                        :

V.                           :
                        :

ANDREW M. SAUL, COMMISSIONER  :
OF SOCIAL SECURITY[1]         :        DATE: AUGUST 13, 2020
                        :
-------------------------------------------------- x

<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ("SSA" or "the Commissioner") denying the plaintiff disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").

I.    <u>PROCEDURAL HISTORY</u>

The plaintiff filed his application for benefits on May 24, 2013, claiming that he had been disabled since October 27, 2011, due to bipolar disorder and hypertension. (Certified Transcript of Administrative Proceedings, dated August 12, 2019 ["Tr."] 90). The application was denied initially on October 2, 2013, (Tr. 90-113), and upon reconsideration on December 19, 2013. (Tr. 116-138). On February 7, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"]. (Tr. 158-59).

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

On December 3, 2014, a hearing was held before ALJ Matthew Kuperstein, at which the plaintiff and Dennis J. King, a vocational expert ["VE"], testified. (Tr. 33-77). The plaintiff was represented by an attorney at the hearing. The ALJ subsequently issued an unfavorable decision on April 3, 2015, denying the plaintiff's claims for benefits. (Tr. 9-25). The plaintiff appealed to the Appeals Council, which, on September 12, 2016, denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

The plaintiff appealed the ALJ's decision to this Court in an action filed on November 9, 2016. *See Howarth v. Commissioner of Social Security*, No. 3:16CV1844(JCH) ("*Howarth 1*"). On December 21, 2017, United States District Judge Janet C. Hall issued a ruling reversing the Commissioner's decision and remanding the case for further proceedings. (Tr. 805-40; *Howarth 1*, Doc. No. 26). In that ruling, the Court remanded the case "for reconsideration of whether Howarth meets or equals the criteria of paragraph C under Listing 12.04." (Tr. 839). On April 11, 2018, the Appeals Council issued a Remand Order, vacating the decision of the Commissioner and remanding the case to an ALJ "for further proceedings consistent with the order of the court." (Tr. 843). In the Remand Order, the Appeals Council stated that the ALJ "will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." (*Id.*).

On December 11, 2018, a second hearing was held before ALJ Kuperstein. (Tr. 714-74). The plaintiff, Teresa Wolford (a VE), and Dr. Bill Fuess (a medical expert) testified. The plaintiff was again represented by an attorney at the hearing. On March 11, 2019, the ALJ issued a second unfavorable decision, again denying the plaintiff's claims for benefits. (Tr. 688-703). No written exceptions were filed, and the Appeals Council did not take "own motion" review, thus, the ALJ's decision became the final, appealable decision of the Commissioner. *See* 20 C.F.R. § 404.984(a)

("[W]hen a case is remanded by a Federal court for further consideration, the decision of the [ALJ] will become the final decision of the Commissioner after remand . . . unless the Appeals Council assumes jurisdiction of the case."); 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of [the] case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand.").

On June 11, 2019, the plaintiff filed his complaint in this pending action. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on June 14, 2019, and this case was transferred to the undersigned. (Doc. No. 8). On August 12, 2019, the defendant filed the administrative transcript. (Doc. No. 10). On October 29, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 14 ["Pl.'s Mem."]), with a Statement of Material Facts (Doc. No. 14-2) and brief in support (Doc. No. 14-1). On December 18, 2019, the defendant filed his Motion to Affirm the Decision of the Commissioner (Doc. No. 15 ["Def.'s Mem."]), with a Statement of Material Facts (Doc. No. 15-2) and brief in support (Doc. No 15-1).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is DENIED, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 15) is GRANTED.

## II.    FACTUAL BACKGROUND

### A.    MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, as detailed in their submissions. Though the Court has reviewed the entirety of the medical records, the Court cites only the portions of the record that are necessary to explain this decision.

B.    _HOWARTH 1_

In _Howarth 1_, the plaintiff argued that the ALJ made several errors in both his step three and step four analysis. The plaintiff first argued that the ALJ erred in step three by failing to evaluate properly whether the plaintiff's impairment met or medically equaled the criteria of Listing 12.04. Specifically, the plaintiff argued that 1) the ALJ decided that paragraph B was not met or equaled without discussing any medical evidence in the record; 2) the ALJ did not consider all of the episodes of decompensation; and 3) the ALJ found that paragraph C was not met or equaled without discussing the evidence or articulating his reasons. (Tr. at 812).

The Court found that "the ALJ's failure regarding paragraph C [was] sufficient to justify remand." (Tr. 812). Because of this finding, the Court "also suggest[ed] that the ALJ revisit the other issues on remand, without finding it necessary to hold that such errors would themselves warrant remand on their own." (_Id._).

Regarding the paragraph C finding, the Court concluded that "the ALJ failed to articulate any reasons at all for his finding that the paragraph C criteria had not been satisfied." (Tr. 813). "The ALJ's decision [did] not even include conclusory statements that Howarth [did] not meet paragraph C." (Tr. 814). Instead, "the court [was] left to infer that the ALJ reached that decision based on the ALJ's ultimate conclusion that Howarth did not meet or equal the listing." (_Id._).

The Court noted, however, that remand was not required "if the ALJ's reasons [could] be discerned from other steps or from evidence in the record." (Tr. 814-15). The Court explained that paragraph C of Listing 12.04 requires the plaintiff to show one of the following: (1) "repeated episodes of decompensation, each of extended duration"; (2) "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"; or (3) "current

4

history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." (Tr. 815, citing 20 C.F.R. § 404.1525 app. 1, Listing 12.04(C) (2015)). The Court found that the ALJ's findings elsewhere in the decision "provide[d] sufficient guidance for the court to determine the ALJ's rationale" as to Listing 12.04(C)(1) and (3) and thus the failure to articulate reasons as to these two provisions was harmless. (Tr. 817).

As to Listing 12.04(C)(2), however, the Court found that "the findings in the rest of the ALJ's opinion d[id] not clearly indicate the ALJ's rationale sufficiently for the court to determine whether his decision [was] supported by substantial evidence." (Tr. 817-18). As the Court reasoned, "Although there is evidence in the record to support the ALJ's conclusion, there is also evidence that indicates marginal adjustment. The ALJ's Decision contains no indication that he considered this evidence in relation to the second criterion beyond a conclusory statement that he considered Paragraph C . . . Thus, without an articulation of the ALJ's reasons, the court cannot review whether the ALJ considered the contrasting evidence or how the ALJ reached his conclusion." (Tr. 818). Accordingly, the Court "remand[ed] for the ALJ to consider the record evidence regarding the Paragraph C criteria, specifically 12.04(C)(2), and to articulate specific reasons for his decision as to whether the listing has been met or equaled." (Tr. 819-20). The Court also "encouraged" the ALJ to articulate his reasons for rejecting criteria (1) and (3). (Tr. 820).

The plaintiff made two further arguments regarding the ALJ's step three analysis in *Howarth 1*. The plaintiff maintained that the ALJ failed to obtain medical opinion evidence on the issue of medical equivalence. (Tr. 820). The Court found that, since it was "already remanding the case to the ALJ for the failure to articulate his reasons [as to 12.04(C)(2)], [it] need not decide

whether the failure to obtain a medical opinion require[d] remand." (*Id*.). The Court did, however, "advise the ALJ to use the opportunity on remand to address this problem." (*Id*.).

Additionally, the plaintiff argued that, "even if the record was sufficient, the ALJ decided that his impairment did not meet or equal paragraph B of Listing 12.04 without considering the medical evidence in the record or articulating his reasons based on it." (Tr. 824). The Court found that the ALJ discussed the medical opinions in the record at step four. (Tr. 826). The Court addressed these findings and then concluded that "there [was] substantial medical evidence in the record to support the ALJ's finding that Howarth's impairment did not meet the criteria in paragraph B." (Tr. 828). Thus, the ALJ's "failure to explicitly cite the medical record evidence would be harmless error not requiring remand." (*Id*.). The Court did, however, "urge[] the ALJ on remand to discuss the medical opinions on paragraph B as well." (Tr. 829).

The plaintiff also argued that the ALJ erred in the treatment of the medical opinion evidence at step four of the analysis. (Tr. 829). Specifically, he challenged the ALJ's decision to give a November 2014 report from APRN Rasie no weight. (*Id*.). The Court found that the plaintiff's argument as to the November 2014 report was "misplaced" because an APRN was not an acceptable medical source, and thus, the November 2014 report was not a treating medical source opinion entitled to controlling weight. (Tr. 831). Moreover, the Court found that the ALJ did not err because there was substantial evidence in the record supporting the ALJ's decision to assign no weight to the opinion. (Tr. 836).

The plaintiff also argued that the ALJ "misread" the November 2013 report of APRN Rasie and Dr. Randall "by substituting 'very little bipolar disorder' for 'very brittle bipolar disorder.'" (Tr. 836). While the Court "agree[d] with Howarth that the ALJ misquoted the report," it concluded

that the ALJ's findings "were nonetheless supported by substantial evidence," such that the misquotation was harmless. (Tr. 838).

The Court granted the plaintiff's motion and remanded "for reconsideration of whether Howarth meets or equals the criteria of paragraph C under Listing 12.04." (Tr. 839).

C.    HEARING TESTIMONY

At the December 11, 2018 hearing, the ALJ first asked the plaintiff how his condition had changed since December 2014. (Tr. 746). The plaintiff responded that his condition had worsened; he noted that he was having hypomanic symptoms and had tried to gain employment in customer service work which did not last. (Tr. 746-47). The ALJ asked whether the plaintiff had tried to find work in occupations which the VE at the earlier hearing had opined would be suitable for the plaintiff. (Tr. 747). He had not. (*Id.*). He had completed computer skills courses at the Bureau of Rehabilitative Services but had no current source of income. (Tr. 749, 751-52). His mother, however, would give him $500 each month. (Tr. 749-50). He lived with his mother in her home, and he would stay there alone for the approximately six months of the year his mother would spend in Florida. (Tr. 750-51). He could grocery shop. (Tr. 753).

The plaintiff's counsel then questioned him. The plaintiff testified that his social contacts since 2011 had been "limited." (Tr. 756). He saw his mother and her partner unless they were away, at which point, he would not see anyone.  (*Id.*). He experienced "racing thoughts" and "lack of sleep." (*Id.*). His sleep problems had decreased over the last year. (*Id.*). When asked how many nights he experienced sleep problems, the plaintiff responded, "Well, currently I'm actually dealing with something else right now." (Tr. 759). When asked again, the plaintiff clarified that, when he had hypomania, he would have problems sleeping every night for a four to six-week period; he stated that, during those periods, he would sleep for six hours a night but not all at one

time. (*Id.*). The plaintiff also testified that he was less able to interact with people during a depressive episode. (Tr. 763). His depressive episodes were not consistent and could last for "weeks at a time." (*Id.*).

Dr. Bill Fuess, a medical expert in the area of mental health, also testified. Having reviewed the plaintiff's medical records, Dr. Fuess testified that the plaintiff's "primary psychiatric diagnosis [was] bipolar disorder." (Tr. 724). He opined that "the records support bipolar disorder as the correct diagnosis," and that it was "a serious impairment." (Tr. 725). He noted that the plaintiff had flights of ideas, deflated self-esteem, distractibility, increased need for sleep, and a tendency toward risk-taking behavior. In his opinion, however, the record did not reflect that the plaintiff met or medically equaled the criteria of the listing for bipolar disorder. (*Id.*). Dr. Fuess opined that the plaintiff had mild limitations in understanding, remembering and applying information, and moderate limitations in interacting with others, concentrating, persisting and maintaining pace, and adapting and managing oneself. (Tr. 725-26).

Dr. Fuess also opined that the plaintiff's bipolar disorder resulted in the plaintiff having ongoing mental residual functional capacity limitations. (Tr. 728). Dr. Fuess indicated that the plaintiff had moderate limitations in interaction, which meant he could have only occasional contact with the public but would be capable of frequent interaction with supervisors and coworkers. (Tr. 728, 730). In his opinion, the plaintiff was capable of understanding, remembering and completing simple, routine, repetitive tasks. (Tr. 728). He would not need additional breaks other than what was normally given in a work situation. (Tr. 729). Dr. Fuess testified that, based on the medical evidence, the plaintiff did not have schizoaffective disorder. (Tr. 730). Dr. Fuess noted that he did not see indications of lack of contact with reality, delusions or hallucinations in

the record. (Tr. 730-31). Lastly, Dr. Fuess testified that the plaintiff did not meet or equal the criteria of Listing 12.04(C). (Tr. 731).

Teresa Wolford, a VE, then testified. She classified the plaintiff's past work as policy holder information clerk, an occupation generally performed by the plaintiff at the sedentary exertional level. (Tr. 766). The ALJ then asked the VE to assume a hypothetical individual, with past work as a policy holder information clerk, between the ages of 41 and 48, who has completed four years of college, and who is limited to work that involves understanding, remembering, and carrying out simple, repetitive routine tasks with only occasional interaction with the public and no more than frequent interaction with coworkers or supervisors. (Tr. 767). The VE testified that such an individual could not perform his past work. (Tr. 768). Such an individual could, however, perform the jobs of routing clerk (74,788 jobs in the national economy), folding machine operator (119,960 jobs in the national economy), and document preparer (97,252 jobs in the national economy). (*Id.*). The VE also testified that being off-task fifteen percent or more of a workday and having one to two absences a month would, in her experience, preclude employment. (Tr. 768-70).

III.   THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ first found that the plaintiff last met the insured status requirements of the Social Security Act on December 31, 2017, and that the

---

[2] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, as a fifth step, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows she cannot perform her former employment, and the Commissioner fails to show that the claimant

plaintiff had not engaged in substantial gainful activity since October 27, 2011, his alleged onset date. (Tr. 694, citing 20 C.F.R. § 404.1571 *et seq.* and 20 C.F.R. § 416.971 *et seq*.).

At steps two and three, the ALJ concluded that the plaintiff had the severe impairment of bipolar disorder, (Tr. 694, citing 20 C.F.R. § 404.1520(c) and § 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 694-95, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Specifically, the ALJ concluded that the plaintiff's bipolar disorder did not meet Listing 12.04. (*Id.*). The plaintiff also had the non-severe impairment of hypertension. (Tr. 694).

At step four, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels, but with the following limitations: he could understand, remember and carry out "simple repetitive routine tasks" with "only occasional interaction with the public and no more than frequent interaction with coworkers or supervisors." (Tr. 697). The ALJ then concluded that the plaintiff was not capable of performing his past relevant work. (Tr. 701, citing 20 C.F.R. § 404.1565 and 416.965).

Finally, at step five, the ALJ found that the plaintiff was 41 years old, a younger individual, on the alleged disability onset date. (Tr. 701 (citing 20 C.F.R. §§ 404.1563 and 416.963)). He had at least a high school education and could communicate in English. (Tr. 702 (citing 20 C.F.R. §§ 404.1564 and 416.964)). The ALJ found that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported

---

can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

a finding that the plaintiff was not disabled, regardless of whether the plaintiff had transferable job skills. (*Id*. (citing SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)). The ALJ then concluded that jobs existed in significant numbers in the national economy that the plaintiff could perform. (*Id*. (citing 20 CFR §§ 404.1569, 404.1569(a), 416.969, 416.969(a))). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from October 27, 2011, the alleged onset date, through March 14, 2019, the date of the decision. (Tr. 702).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the

reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff contends that the ALJ 1) failed to comply with the Court's ruling in *Howarth 1*; and 2) did not fully develop the record. The defendant argues that substantial evidence supports the ALJ's decision. Specifically, the defendant claims that 1) the ALJ provided an explicit discussion of the criteria of Listing 12.04(C)(2) in accordance with the Court's ruling in *Howarth 1*; and 2) the ALJ did not need to take more steps to seek further evidence.

A.    THE ALJ DID NOT FAIL TO COMPLY WITH THE COURT'S RULING IN *HOWARTH 1* AND EXPLAINED ADEQUATELY HIS LISTING 12.04(C)(2) FINDING

The plaintiff argues that the ALJ failed to comply with the decision in *Howarth 1*. (Pl.'s Mem. at 4-6). The plaintiff's claims in this section can be divided into two categories: arguments regarding the sufficiency of the record and arguments that the ALJ did not adequately explain his Listing 12.04(C)(2) finding. The plaintiff maintains that the ALJ failed to develop the record by refusing to allow the plaintiff to testify regarding his history of hospitalizations, and by failing to elicit testimony from Dr. Fuess regarding an October 2014 episode of decompensation. In addition, the plaintiff argues that the ALJ did not properly discuss the Listing 12.04(C)(2) criteria.

First, the plaintiff appears to suggest that the ALJ failed to develop the record by not allowing certain testimony from the plaintiff and by not eliciting specific testimony Dr. Fuess at the plaintiff's December 11, 2018 hearing. Specifically, the plaintiff maintains that, by refusing to

allow testimony on the plaintiff's history of hospitalizations, "an issue identified as relevant by Judge Hall," the ALJ did not comply with the remand order. (Pl.'s Mem. at 5).[3] The plaintiff also argues that the ALJ erred by failing to elicit testimony from Dr. Fuess on the plaintiff's "previous dependence on his mother and brother, and an episode of decompensation in October 2014." (*Id*.). He contends that Dr. Fuess's testimony on the paragraph C criteria "falls well short of the remand's directive to further develop the record on this issue." (Pl.'s Mem. at 6).

Contrary to the plaintiff's argument, neither the decision in *Howarth 1*, nor the Appeals Council's April 11, 2018 Remand Order directed the ALJ to take specific steps regarding the development of the record. In *Howarth 1*, the Court found that "the ALJ failed to articulate any reasons at all for his finding that the paragraph C criteria had not been satisfied." (Tr. 813). Because the Court was able to identify the ALJ's rationale for his Listing 12.04(C)(1) and (3) findings from other portions of the decision, however, the Court found that the ALJ's failure to articulate specific

---

[3] The plaintiff's brief suggests that the ALJ would not allow testimony on any of the plaintiff's hospitalizations, when in fact, the ALJ precluded only questions regarding the plaintiff's 2005 hospitalization:

Q: And then you were working when you were hospitalized in 2005, correct?
A: Correct.
Q: Just very briefly, if you could explain to the Court, what happened, what you experienced that led to that hospitalization in 2005.
A: Let's see. I was told that – at the time I was – I believe being – let's say I was under or I was – let's see. I think that – well, I was told that I was being like or watched as far as – it's hard to describe. I was under like – it's like – well, I was told that I was –
ALJ: Counsel, this is prior to the period at issue. Let's focus on the period of time especially since the claimant's alleged onset date in 2011 as opposed to this earlier period. I don't see any relevancy to going in this direction.
ATTY: Well, I mean the case has been pending for years. He's been –
ALJ: I realize that, Counsel.
ATTY: – waiting four years to be able to put his case back on, and I think the claimant should be able to present his case, and I claim the question.
ALJ: No. I'm not going to allow it any further. Like I said, we're –
ATTY: Okay.
ALJ: – looking at the –
ATTY: Then –
ALJ: – period 2011 forward.
ATTY: – I claim it for the record, and I'll move on, Your Honor.

(Tr. 754-55).

reasons as to those two criteria was harmless error. (Tr. 817). Still, although the Court remanded on the Listing 12.04(C)(2) finding, it also directed the ALJ to expand on his reasoning as to Listings 12.04(C)(1) and (3). (Tr. 819-20). As the decision explained, "[T]he court remands for the ALJ to consider the record evidence regarding the paragraph C criteria, specifically 12.04(C)(2), and to articulate specific reasons for his decision as to whether the listing has been met or equaled. On remand, the ALJ is also encouraged to articulate his reasons for rejecting criteria (1) and (3), even though the court was able to identify his rationale from other portions of the Decision." The issue for remand was thus the need to articulate reasons related to Listing 12.04, not any requirement to develop further the record.[4]

The Appeals Council's April 11, 2018 Remand Order then vacated the decision of the Commissioner and remanded the case to an ALJ "for further proceedings consistent with [the December 21, 2017] order of the court." (Tr. 843). In the Remand Order, the Appeals Council stated that the ALJ "will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." (*Id.*). Nothing in the Remand Order suggested that the ALJ needed to obtain specific testimony. Notably, the plaintiff argued in the prior action that the ALJ had failed to obtain medical opinion evidence on the issue of medical equivalence. The Court did not remand on this basis but encouraged the ALJ to obtain such medical opinion evidence on remand, which he did by obtaining Dr. Fuess's expert testimony.

---

[4] The plaintiff states that hospitalizations were an issue identified as relevant by the Court in *Howarth 1*. In *Howarth 1*, the Court noted the plaintiff's history of hospitalizations in finding that the ALJ failed to articulate his reasons as to why the plaintiff's impairment did not meet the criteria of Listing 12.04(C)(2). "Although there is evidence in the record to support the ALJ's conclusion, there is also evidence that indicates marginal adjustment." (Tr. 818). The Court thus cited the plaintiff's history of hospitalizations as one piece of evidence supporting the existence of marginal adjustment. The Court noted that, among other things, "there is also evidence in the record that Howarth had a history of hospitalizations that, while not rising to the level of repeated episodes of decompensation under criterion 12.04(C)(1), were nonetheless numerous." (*Id.*). The Court was, however, unable to determine whether the ALJ considered this evidence absent a discussion of the paragraph C criteria. (*Id.*). Thus again, the issue for the Court was the need to articulate reasons, not to develop the record.

(*See* Tr. 820 ("Given that the court is already remanding the case to the ALJ for the failure to articulate his reasons above, the court need not decide whether the failure to obtain a medical opinion itself requires remand. Instead, the court discusses the issues below to advise the ALJ to use the opportunity on remand to address the problem.")). Thus, the Court finds no error in the ALJ's development of the record at the plaintiff's December 11, 2018 hearing.

Additionally, the plaintiff argues—in one paragraph—that the ALJ "did not provide a sufficient discussion" of the Listing 12.04(C)(2) criteria. (Pl.'s Mem. at 6). The Court disagrees. Substantial evidence supports the ALJ's finding that the plaintiff did not meet Listing 12.04(C)(2). To meet the Listing 12.04(C)(2) criteria, claimants must show "[m]arginal adjustment, that is, [that they] have minimal capacity to adapt to changes in [their] environment or to demands that are not already part of [their] daily life." 20 C.F.R. Part 404, Subpt. P, App 1, §12.04(C)(2). An individual "ha[s] achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of [the individual's] symptoms and signs and to deterioration in [their] functioning." 20 C.F.R. Part 404, Subpt. P, App 1, §12.04(G)(2)(c). For example, marginal adjustment may exist if an individual "become[s] unable to function outside of [the] home or a more restrictive setting, without substantial psychosocial supports," when "deterioration may have necessitated a significant change in medication or other treatment," or if an individual is "required to be hospitalized or absent from work" to an extent that makes it "difficult . . . to sustain work activity over time." *Id*.

In the decision, the ALJ stated that he "considered whether the 'paragraph C' criteria [were] satisfied," and found that "the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. 696). According to the ALJ, "[t]he record does not establish that the [plaintiff] has only marginal adjustment, that is, a minimal capacity to adapt to changes in the [plaintiff's] environment

or to demands that are not already part of the [plaintiff's] daily life." (*Id*.). The ALJ stated that, "[w]hile counsel has argued that the [plaintiff] lives in a sheltered type living situation, the [plaintiff] is able to live on his own when his mother is away." (*Id*.). The ALJ also noted that the plaintiff "drives, goes shopping, goes to the casino, and takes computer classes," that "he was more relaxed after his mother left for the winter," and that he "has not needed any assistance managing his medication." (Tr. 696-97). The ALJ found that, "[i]ndeed, [the plaintiff] has more than a minimal capacity to adapt to changes." (Tr. 697).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's finding. The ALJ cited the plaintiff's reported daily activities as well as the medical opinion testimony before finding that he did not meet the paragraph C criteria, particularly because the plaintiff failed to establish marginal adjustment. Specifically, the ALJ cited the plaintiff's testimony that he was more relaxed when his mother was away and evidence that he was able to live independently for long periods of time. (Tr. 696, 48-49, 350, 1101, 1142, 1207). The plaintiff lived alone when his mother lived in Florida. (Tr. 751). He went to the casino and attended computer classes. (Tr. 749, 752-53). He could drive and go grocery shopping. (Tr. 753). Moreover, Dr. Fuess testified that the plaintiff did not meet the criteria of Listing 12.04. (Tr. 725). Dr. Fuess stated that the plaintiff's "primary psychiatric diagnosis [was] bipolar disorder." (Tr. 724). Dr. Fuess cited the plaintiff's various medical records, which reflected treatment for bipolar disorder, and opined that the diagnosis was correct. (Tr. 724-25). In his opinion, however, the plaintiff had mild limitations in understanding, remembering and applying information; moderate limitations in interacting with others; moderate limitations in concentration, persistence and pace; and moderate limitations in adapting and managing oneself. (Tr. 725-26). Dr. Fuess also specifically testified

that the plaintiff had not met or equaled the requirements of paragraph C. (Tr. 731). The ALJ thus provided sufficient reasons why the plaintiff had not met the criteria of Listing 12.04(C)(2).

The plaintiff faults the ALJ for not citing to medical evidence in his discussion of the paragraph C criteria and specifically not discussing the plaintiff's "2014 episode during which the plaintiff decompensated and would likely have been hospitalized again but for the intervention of his family." The plaintiff appears to be referring to an October 2014 episode referenced in LCSW Richard Conover's November 6, 2014 psychosocial assessment: "During the past month Mr. Howarth had a period of mania following his mother's departure to Florida. . . . He began to rely heavily on medication at this time leading to his mother's return home to attend to her son's episode. Mr. Howarth has since stabilized and his mother has returned to Florida." (Tr. 529).

A remand is not required on this basis, however, because the ALJ had no obligation to discuss this particular incident. *See Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (holding that, where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient") (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

Contrary to the plaintiff's argument, the remand order did not direct the ALJ to discuss specifically any particular evidence. Indeed, in *Howarth 1*, the Court found that, "[a]lthough there is evidence in the record that would support the ALJ's conclusion, there is also evidence that indicates marginal adjustment." (Tr. 818). "[W]ithout an articulation of the ALJ's reasons, the court cannot review whether the ALJ considered the contrasting evidence or how the ALJ reached his conclusion." (*Id.*). One piece of evidence that the Court noted would support a finding of marginal adjustment was evidence of the plaintiff's previous dependence on his mother and

brother. The Court noted the following: "For example, the trial transcript indicates that he had an episode of decompensation in October 2014, which social worker Conover notes was precipitated by his mother's return to Florida, and had his mother not returned to care for him, his attorney believes he would have been hospitalized again . . . Because the ALJ provides no discussion regarding the paragraph C criteria at all, the court is unable to determine whether the ALJ considered this evidence." (Tr. 819). The Court thus took issue with the ALJ's failure to discuss the paragraph C criteria at all but did not direct the ALJ to discuss any particular piece of evidence.

Here, the ALJ adequately explained his finding that the plaintiff did not meet the criteria of Listing 12.04(C). As noted above, the ALJ cited the plaintiff's reported daily activities, the plaintiff's statement that he was more relaxed after his mother had left, and the opinion of Dr. Fuess. Therefore, a remand is not warranted on this basis.

Moreover, though the plaintiff appears to argue that the ALJ should have found marginal adjustment based on the plaintiff's alleged dependence on his mother in October 2014, this Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the Court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id*. Upon a thorough review of the medical record, the Court concludes that it was reasonable for the ALJ to find that the plaintiff did not have only marginal adjustment.

The plaintiff has a long history of mental illness. He was diagnosed with bipolar disorder in 1987, and has been hospitalized seven times—in 1987, 1991, 1992, 2005, 2011 and 2013—for recurrent manic and depressive episodes. The plaintiff has seen a number of psychiatrists and therapists, who have treated his bipolar disorder with medication and therapy.

In February 2012, the plaintiff initiated a treatment relationship with Universal Counseling Services in Maryland for management of his bipolar disorder. (Tr. 342). At that time, he lived alone in an apartment. (Tr. 350). Examination results were normal. (Tr. 351-52). In March 2012, the plaintiff reported that he "sleeps in a little more than intended." (Tr. 355). Examination results were normal, and the plaintiff was told to continue his current medication regimen. (Tr. 355-56). In May and July 2012, the plaintiff reported "a little chronic depressive symptoms" over the last few months. (Tr. 357, 359). Examination results were again normal. (Tr. 357-58, 59-60).

Treatment notes from September 2012 reflect that the plaintiff's "mood continue[d] to be stable." (Tr. 361). Examination results were normal. (Tr. 361-62). In November 2012, the plaintiff reported that had not had "much improvement"; he had higher energy when on Welbutrin in the past but did not want to go back on the medication because he had manic episodes while on it. (Tr. 363). Examination results were normal. (Tr. 363-64). In January 2013, the plaintiff reported that his energy levels were low, particularly in the morning. (Tr. 365). He explained that the medications he had been on for 20 years "have been successful to an extent, but we may want to look at other alternatives or options." (*Id*.). Examination results were normal. (Tr. 365-66). In early February 2013, the plaintiff reported that he was having additional trouble falling asleep. (Tr. 367). Treatment notes reflect that "[h]e knows from his past that this type of change commonly precedes deterioration in his mood that resulted in hospitalization in the past." (*Id*.).

From February 16 to February 26, 2013, the plaintiff received inpatient treatment at the Sheppard Pratt Hospital in Maryland. He had been taken to the emergency room by his brother. (Tr. 337). The plaintiff had been experiencing mood instability, racing thoughts, poor sleep, flight of ideas, and irritability. (Tr. 338).

In April 2013, the plaintiff returned to the Outpatient Mental Health Clinic. (Tr. 369). The plaintiff reported that his mood was depressed; he was frustrated due to lack of structure and not having a job. (*Id*.). Examination results were normal except for dysphoric mood. (*Id*.). In May 2013, the plaintiff reported that his mood was less depressed. (Tr. 373). He continued to feel frustrated about not having a job. (*Id*.). In July 2013, the plaintiff had stopped taking Welbutrin, one of his medications, due to trouble sleeping, racing thoughts and hypomania. (Tr. 381).

In August 2013, the plaintiff returned to Connecticut. The plaintiff began seeing APRN Sylvia Rasie in September 2013. A September 9, 2013 examination was normal, except that the plaintiff had fair judgment and impulse control. (Tr. 453-54). In October 2013, the plaintiff "fel[t] stable" and wanted to stay on his current medication regimen. (Tr. 452). In November 2013, the plaintiff reported increase lethargy. (*Id*.). Treatment notes reflect that he was going to spend the holidays in Baltimore. (*Id*.). In December 2013, the plaintiff reported "some periods of depression." (*Id*.). In January 2014, the plaintiff was still depressed and "feeling okay but a bit tired." (*Id*.). In February 2014, the plaintiff remained stable. (Tr. 451). He explained that he "gets up when he has a place to go." (*Id*.). In March 2014, the plaintiff reported "feeling like he might be able to go back to work." (*Id*.). He stated, "My spirits are higher." (*Id*.).

The plaintiff began seeing Paul Clark MSW in late March 2014 for weekly sessions. (Tr. 470-71). In March, he reported that he plays poker at the casino two to three times per week. (Tr. 471). He also reported minimal depression, decreased energy and decreased motivation. (Tr. 467). In April 2014, the plaintiff reported experiencing decreased energy and decreased motivation, frustration about his unemployment and uncertainty about his career. (Tr. 464-66). He complained of ongoing depression and increasing problems with gambling. (Tr. 458-61).

In May 2014, the plaintiff reported to APRN Rasie that his mood was "fairly even," but "a little on the side of depression." (Tr. 474). He also continued to see Mr. Clark. (Tr. 612-13). In late June, he reported depressed mood, decreased energy, and difficulty with his employment search. (Tr. 610-11). In July 2014, the plaintiff reported "feeling better." (Tr. 474). The plaintiff discontinued therapy at the end of July. (Tr. 602-03).

The plaintiff began seeing Richard Conover LCSW for weekly therapy sessions on July 31, 2014. (Tr. 687). In October 2014, the plaintiff reported to Mr. Conover that he had not been sleeping well. (Tr. 685). Treatment notes reflect that the plaintiff was somewhat tangential in his presentation, with grandiose effect continued throughout the session. (*Id*.). At the next appointment, the plaintiff brought his mother and brother, who had visited him at his request. (*Id*.). Throughout October, the plaintiff improved, but required continuing treatment. (*Id*.). In November 2014, the plaintiff presented to Mr. Conover in a lethargic sleepy state. (Tr. 684).

In February 2015, the plaintiff began therapy with APRN Audrey Allen. (Tr. 1108). At that appointment, he discussed "wean[ing]" off his medications. (*Id*.). In April 2015, the plaintiff reiterated this intention, stating that he "ha[d] been fine for a couple of years." (Tr. 1107). In July 2015, he reported that the lithium reduction plan was working well, but he had trouble sleeping. (Tr. 1104). In September 2015, he reported to APRN Allen that he became hypomanic for the two months he was off his medications. (Tr. 1103). He resumed his original doses. (*Id*.). In November 2015, the plaintiff reported that he had been in a "funk." (Tr. 1102). Treatment notes reflect a notation about a "job situation." (*Id*.). In January 2016, the plaintiff reported that he had started weekly sessions with Dr. Zita. (Tr. 1101). APRN Allen suggested volunteer work (*Id*.).

In March 2015, the plaintiff reported to APRN Allen that he was working with Dr. Zita on "work + structure." (Tr. 1100). In May 2016, the plaintiff was doing "alright"; he was working

with Dr. Zita and the Bureau of Rehabilitative Services to find part-time employment. (Tr. 1099). In July 2016, the plaintiff told APRN Allen that he might get a job at a customer call center. (Tr. 1098). He reported that his energy was "sapped" from a family gathering. (*Id*.). In October 2016, the plaintiff reported that this was the "time of year when [he] stays in bed" but "[i]f [he] gets a job [he] will have something to go to." (Tr. 1096). In February 2017, the plaintiff reported a period of increased energy, but he took Zyprexa to manage his symptoms. (Tr. 1113). He also reported that he was experiencing lower energy and staying in bed longer. (*Id*.).

In May 2017, the plaintiff told APRN Allen that Dr. Zita had noted a cycling tendency to his bipolar disorder. (Tr. 1116). Treatment notes reflect that he was "[c]urrently in slight depressed mode." (*Id*.). He was currently seeking a job. (*Id*). In August 2017, the plaintiff appeared to APRN Allen "in the midst of hypomania." (Tr. 1119). He reported that he was "unclear if it was the Latuda or the things that are going on in the world." (*Id*.). APRN Allen prescribed Zyprexa for sleep "until he recompensates." (*Id*.). He had been experiencing racing thoughts, manic mood and poor sleep pattern. (Tr. 1119-1121). In October 2017, the plaintiff reported a hypomanic episode that caused him not to look for a job. (Tr. 1123). He now felt depressed. (*Id*.). In December 2017, the plaintiff reported feeling more depressed in the winter months. (Tr. 1127).

In May 2018, the plaintiff returned to APRN Allen, complaining of sleep problems. (Tr. 1134). He denied problems with energy or motivation. (*Id*.). In July 2018, APRN Allen noted that the plaintiff was "doing well." (Tr. 1154). Treatment notes from September 2018 reflect that the plaintiff was "doing fairly." (Tr. 1151). The plaintiff was not hypomanic. (*Id*.). His mother's boyfriend was dying and he was uncomfortable with hospice in their home. (*Id*.). Thus, these medical records support the ALJ's conclusion that the plaintiff did not experience marginal adjustment.

Moreover, the plaintiff's activities of daily living provide additional support for the ALJ's marginal adjustment finding. The plaintiff lived independently while his mother resided in Florida during the winter, he drove, went shopping, and attended computer classes. Further, the record reflects that the plaintiff "made goals to return to work and . . . sought assistance from the Bureau of Rehabilitation Services." (Tr. 696).

"[I]t is not enough for the [the plaintiff] to merely disagree with the ALJ's weighing of the evidence . . . [The plaintiff] must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record." *Hanson v. Comm'r of Soc. Sec.*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016). Accordingly, because the ALJ's finding that the plaintiff had more than minimal capacity to respond to changes is supported by substantial evidence in the record, a remand is not warranted based on any alleged error regarding the Listing 12.04(C)(2) finding.

### B.    THE ALJ DID NOT FAIL TO DEVELOP THE RECORD

The plaintiff also argues that the ALJ failed to develop the record. In particular, he claims that 1) the ALJ should have sent more than only one letter to Dr. Zita requesting treatment notes after the December 11, 2018 hearing; and 2) the ALJ should have held a supplemental hearing for Dr. Fuess to testify regarding Dr. Zita's 2019 submission.[5] (Pl.'s Mem at 6-9).

The ALJ's failure to obtain Dr. Zita's treatment notes and decision not to hold a supplementary hearing for consideration of his 2019 submission do not warrant remand. "It is the rule in our circuit that the ALJ, unlike the judge in a trial, must himself affirmatively develop the record." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see*

---

[5] The plaintiff states, in one paragraph, that LCSW Richard Conover's treatment notes do not appear in the record. (*See* Pl.'s Mem. at 7).  He is incorrect. Mr. Conover's treatment notes from appointments between July 31, 2014 and December 4, 2014 are in the record. (Tr. 681-87).

*Moreau*, 2018 WL 1316197, at *4 ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)). The ALJ must develop the record even where the claimant has legal counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

An ALJ, however, is "required affirmatively to seek out additional evidence only where there are obvious gaps in the administrative record." *Eusepi v. Colvin*, 595 F. App'x. 7, 9 (2d Cir. 2014) (summary order); *see also Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history the ALJ is under no obligation to seek additional information"); *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order) ("The ALJ is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability."); *Morris v. Berryhill*, 721 F. App'x 25, 28 (2d Cir. 2018) (summary order) (finding that the ALJ was not obligated to seek additional treatment notes where the ALJ already had records from that source; "[t]he duty to recontact arises only if the ALJ lacks sufficient evidence in the record to evaluate the doctor's findings").

Here, the ALJ and the plaintiff's counsel discussed Dr. Zita's treatment notes at the December 11, 2018 hearing. (Tr. 717-20, 741-44). During this discussion, the ALJ acknowledged that Dr. Zita's treatment notes were missing from the record. (Tr. 719).[6] The plaintiff's counsel requested two weeks to obtain the treatment notes, and the ALJ stated that he would leave the record open. (Tr. 720, 741-42). The plaintiff then indicated that Dr. Zita had told him the request would need to come from "the Social Security disability department"; he would not respond to a

---

[6] On May 21, 2018, Dr. Zita provided a treatment summary. (Tr. 1141-43). Dr. Zita indicated that he was providing the treatment summary in response to a request for the plaintiff's treatment records. He explained that "[s]ince [his] records are handwritten and mostly illegible to others [he] [is] providing [a] treatment summary." (Tr. 1141).

request from the plaintiff's counsel. (Tr. 743). The ALJ, therefore, instructed the plaintiff to fill

out an updated disclosure form before leaving and indicated that he would request the treatment

notes from Dr. Zita. (Tr. 743-44). Upon receiving the notes, the ALJ would determine their

legibility and decide whether a supplemental hearing was necessary. (Tr. 744).

Later that day, the plaintiff's counsel emailed Dr. Zita informing him that "ALJ Kuperstein

will soon send [him] a request for copies of [his] treatment notes." (Tr. 1024-25). In response, Dr.

Zita stated the following:

> First, my notes ARE in the medical record. . . My handwriting is atrocious to
> anyone but me. The notes are in the medical record nonetheless. Second, because
> my notes are illegible to anyone but me, I wrote not one but two detailed treatment
> summaries (with Mr. Howarth's signed ROI) to Disability Determination
> Services. The first summary requested by DDS concerned treatment provided
> 2017 to the present . . . The second request for information concerned treatment
> provided 2015-2016. That summary also included my initial diagnostic note which
> was typed. The second summary was sent on June 20, 2018. Apparently, this
> document was not entered in[] the proceedings.

(Tr. 1024). At that time, Dr. Zita's initial diagnostic note and treatment summary for 2015 and

2016 were not in the record, though he indicated he submitted them on June 20, 2018. A review

of the record does not reveal any handwritten treatment notes by Dr. Zita.

The ALJ thereafter requested Dr. Zita's medical records. (*See* Tr. 1029). Dr. Zita ultimately

provided an eleven-page submission on January 17, 2019. (Tr. 1203-13). Included in that

submission were 1) "[t]he current request for records . . . in the form of a treatment summary

(below)"; 2) "the previously submitted initial diagnostic note dated November 30, 2015"; 3) "the

previously submitted treatment summary for 2015-2016 dated June 20, 2018"; and 4) a "[b]rief

summary of progress dated January 17, 2019." (Tr. 1204). This submission did not include any

handwritten treatment notes.

On February 1, 2019, the plaintiff's counsel wrote to the ALJ, indicating that he had uploaded Dr. Zita's reports and requesting that they be admitted into evidence. (Tr. 1031). He also noted: "If desired, the [plaintiff] will appear at a supplemental hearing or otherwise cooperate for the purpose of further development of the record." (*Id.*).  Dr. Zita's reports were ultimately added to the administrative record and considered by the ALJ. (Tr. 1203-13).

The ALJ was not obligated to take further steps to obtain Dr. Zita's handwritten treatment notes. Dr. Zita had represented that his handwritten treatment notes were illegible, (Tr. 1141), and he instead provided multiple treatment summaries. (Tr. 1141-43, 1203-13). The ALJ cited these treatment summaries throughout the decision. (Tr. 695-97, 699-700). The ALJ also found that Dr. Zita's submissions did not indicate that the plaintiff had any functional limitations as a result of his impairments. (Tr. 700). Though the plaintiff argues that the record was incomplete without the treatment notes, he does not explain their materiality, especially in light of Dr. Zita's own statements that his handwritten notes were illegible and, therefore, not useful. Because the ALJ already possessed a complete medical history, including multiple submissions from Dr. Zita, there was no "obvious gap" that the ALJ needed to remedy by obtaining Dr. Zita's handwritten treatment notes. *See Eusepi*, 595 Fed. App'x. at 9; *Rosa*, 168 F.3d at 79 n.5; *Janes*, 710 F. App'x at 34; *Morris*, 721 F. App'x at 28. Therefore, the ALJ did not err in failing to do so.

The plaintiff's argument that the ALJ was required to hold a supplemental hearing similarly fails. At the plaintiff's December 11, 2018 hearing, the only medical evidence in the record from Dr. Zita was his May 21, 2018 treatment summary. (Tr. 1141-43). As discussed above, Dr. Zita sent the ALJ a supplemental submission on January 17, 2019. (Tr. 1203-13). The plaintiff appears to be arguing that, had Dr. Fuess reviewed Dr. Zita's January 17, 2019 submission, his hearing testimony would have been different and thus the ALJ was obligated to hold a supplemental

hearing to obtain further testimony from Dr. Fuess. According to the plaintiff, without such a supplemental hearing, the ALJ erred by affording Dr. Fuess's testimony significant weight.

The Court disagrees. Preliminarily, the plaintiff did not request a supplementary hearing. Indeed, in his February 1, 2019 letter to the ALJ, the plaintiff's counsel noted that "the [plaintiff] [would] appear at a supplemental hearing" "[i]f desired." (Tr. 1031). The plaintiff did not argue that such a supplementary hearing was necessary (until now).

Additionally, contrary to the plaintiff's argument, Dr. Zita's January 17, 2019 statements do not render Dr. Fuess's earlier medical opinion inaccurate. Nothing in Dr. Zita's January 17, 2019 submission suggests that it would have changed Dr. Fuess's testimony. *See Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order) ("No case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record, and in this case the additional evidence does not raise doubts as to the reliability of [the State agency consultant's] opinion.").

Indeed, nothing in Dr. Zita's January 17, 2019 submission addressed the plaintiff's functional limitations. In the submission, Dr. Zita summarized his treatment of the plaintiff from May 2018 to January 2019. (Tr. 1204). Dr. Zita noted that throughout May 2018, the plaintiff "remain[ed] cognitively disorganized" and had a "flat affect." (*Id*.). The plaintiff noted that he felt "crowded" when his mother returned from Florida. (*Id*.). The plaintiff thereafter raised the possibility of volunteer work multiple times during his sessions but took no action. (*Id*.). His affect brightened over the course of several months in response to treatment with Latuda but at no point reached a state of euthymic mood. (*Id*.). In mid-October he started his annual use of light therapy for his recurring seasonal affective disorder. (*Id*.). "As the season progressed, he became increasingly focused on the SSD hearing scheduled for December 11, 2018." (*Id*.). Dr. Zita noted

an "increased flattening of affect with the later emergence of anxiety as the hearing date approached." (Tr. 1206). "With the start of the new year he was able to relax somewhat after his mother left the home for a winter away." (*Id*.). The ALJ specifically considered this submission and gave it little weight because it "did not address any functional limitations or suggest that the claimant has a greater level of mental residual functional capacity limitation than described in this finding for the further periods that are addressed by his notes." (Tr. 700). The ALJ also noted that "the current notes that were provided by Dr. Zita were similar to the earlier ones." (*Id*.).

Finally, an ALJ has discretion on whether to seek additional evidence. *See* 20 C.F.R. §§ 404.1513(a)(b)(2), 404.1520(b), 416.913a(b)(2), 416.920b. As discussed above, an ALJ is "required affirmatively to seek out additional evidence only where there are obvious gaps in the administrative record." *Eusepi v. Colvin*, 595 Fed. App'x. 7, 9 (2d Cir. 2014) (summary order); *see also Rosa v. Callahan*, 168 F.3d at 79 n.5; *Janes*, 710 F. App'x at 34; *Morris*, 721 F. App'x at 28. At issue here was whether the plaintiff met Listing 12.04(C). The ALJ cited Dr. Zita's January 17, 2019 submission in the decision, making it clear that he reviewed and considered the evidence. (Tr. 695-97, 700). The ALJ also noted that "the current notes that were provided by Dr. Zita were similar to the earlier ones." (Tr. 700). Further, the ALJ relied on the opinions of three psychologists who each opined that the plaintiff did not meet the paragraph C criteria. (Tr. 96, 122, 725). In light of these facts, and upon review of Dr. Zita's January 17, 2019 submission, the Court cannot find that the ALJ failed to develop the record by not requesting Dr. Zita's treatment notes or erred in not holding a supplemental hearing so that Dr. Fuess could testify regarding  Dr. Zita's 2019 submission.

VI.   <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is DENIED, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 15) is GRANTED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 13th day of August, 2020 at New Haven, Connecticut.

<u>  /s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge